**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 23-2046

CLARENCE DELANO BELTON, JR.,

        Plaintiff - Appellee,

   v.

HEATHER LOVERIDGE,

        Defendant - Appellant,

   and

CITY OF CHARLOTTE,

        Defendant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Max O. Cogburn, Jr., District Judge. (3:22-cv-00060-MOC-SCR)

Argued: October 30, 2024                        Decided: February 26, 2025

Before NIEMEYER, THACKER, and QUATTLEBAUM, Circuit Judges.

Vacated and remanded with instructions by published opinion. Judge Niemeyer wrote the opinion, in which Judge Thacker and Judge Quattlebaum joined.

**ARGUED:** Steven Andrew Bader, CRANFILL SUMNER LLP, Raleigh, North Carolina, for Appellant. Mark Lowell Hayes, LAW OFFICE OF MARK L. HAYES, Durham, North Carolina, for Appellee. **ON BRIEF:** Stephanie H. Webster, CRANFILL SUMNER LLP,

Charlotte, North Carolina, for Appellant.  Kathleen C. Clary, Amanda A. Mingo, RAWLS, SCHEER, CLARY & MINGO, PLLC, Charlotte, North Carolina, for Appellee.

NIEMEYER, Circuit Judge:

The district court denied Charlotte-Mecklenburg Police Officer Heather Loveridge qualified immunity as to a federal claim and public officers' immunity as to state claims asserted against her by a fellow law enforcement officer whom she shot by mistake when the two — along with other officers — were engaged in attempting to seize a violent suspect pursuant to a warrant. The district court concluded that because the facts material to *liability* were disputed and therefore precluded summary judgment on the merits, the facts material to *immunity* were also disputed and therefore precluded granting Officer Loveridge immunity. But in doing so, the court failed to conduct the distinct analysis required for determining immunity, which includes identifying the clearly established constitutional right that Officer Loveridge violated either knowingly or because she was plainly incompetent in light of clearly established law. *See Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam). Accordingly, we vacate and remand for further proceedings consistent with this opinion.

I

In the early morning of November 1, 2019, a group of six law enforcement officers attempted to execute a search warrant at the house of Larry McConneyhead in Charlotte, North Carolina, as McConneyhead was suspected of trafficking in methamphetamine. The officers knew that McConneyhead was potentially violent, as he had served a 15-year sentence in federal prison for murder and was affiliated with a bike gang. They also believed that McConneyhead likely had weapons in his house.

3

The group enforcing the search warrant included four officers of the FBI's Safe Streets Task Force, Task Force Officers ("TFOs") Clarence Belton (the plaintiff in this case), Derick Meek, Joshua Hendrick, and Justin Padgett. It also included two Charlotte-Mecklenburg police officers, Heather Loveridge (the defendant in this case) and Nicholas Pezzeca, to show a police presence with marked vehicles and provide backup support.

As the group waited in their vehicles near McConneyhead's house, McConneyhead opened his garage door at around 6 a.m. and emerged with a bag of trash that he was apparently taking to the street. When TFOs Belton and Meek approached McConneyhead, identified themselves as law enforcement officers, and instructed him to get on the ground, McConneyhead turned and ran back into the garage and into the house, locking the door to the house behind him. When TFO Belton announced on his radio that McConneyhead was "running," the other TFOs, as well as Officers Loveridge and Pezzeca, exited their vehicles and came to the scene. TFO Meek obtained a battering ram to break down the house door and the other three TFOs entered the garage. Officer Loveridge entered the garage for several seconds but then retreated to a position outside the garage door, and Officer Pezzeca went around to the back of the house to guard against escape at that location.

After TFO Belton knocked on the door and loudly announced, "Police, Search Warrant," TFO Meek rammed open the door. Inside, a woman in a shooter's stance faced the TFOs and aimed a silver revolver at them. TFO Belton yelled, "Gun, gun!," and fired one or two shots toward the woman. TFO Hendrick, who was standing behind TFO Belton, also fired, but one of his shots accidentally hit Belton in the right arm, causing him to drop his gun and fall to the ground. As TFO Belton then crawled on the ground to find cover,

4

TFOs Meek and Padgett scrambled out of the garage. TFO Hendrick also fell back but tried to provide cover for TFO Belton. When the shots were fired, Officer Loveridge, who was just outside the garage door, fired behind the two exiting TFOs at TFO Belton, who was on the ground, believing that he was McConneyhead. In a single burst, she fired over 10 shots in Belton's direction in the course of a few seconds. When someone yelled, "He's a cop," Officer Loveridge immediately stopped firing. She then called on her radio, "10-33, officer down, we need MEDIC now" and attempted to provide aid to TFO Belton while waiting for the arrival of the medics.

TFO Belton suffered wounds to both arms that required several surgeries, and his injuries, which are permanent, prevent him from continuing to serve as a law enforcement officer.

Thereafter, the North Carolina State Bureau of Investigation conducted an investigation of the incident, and the District Attorney for Mecklenburg County decided not to seek charges against Officer Loveridge for her use of deadly force against TFO Belton, citing the difficulty of proving beyond a reasonable doubt that her use of such force was unreasonable under the circumstances. The Internal Affairs Bureau of the Charlotte-Mecklenburg Police Department also conducted an investigation and determined that Officer Loveridge had violated the Department's directive regarding the use of deadly force. It recommended that her employment be terminated.

TFO Belton commenced this action against Officer Loveridge and the City of Charlotte in North Carolina state court, and the defendants removed it to federal court. In his amended complaint, Belton alleged in four counts: (1) a claim under 42 U.S.C. § 1983

5

against Officer Loveridge in her individual capacity, asserting that she used excessive force against him, in violation of the Fourth Amendment; (2) a negligence claim against the City of Charlotte and Officer Loveridge in her official capacity; (3) an assault and battery claim against Officer Loveridge in her individual capacity; and (4) a negligent infliction of emotional distress claim against Officer Loveridge in both her official and individual capacities.

Officer Loveridge filed a motion for summary judgment asserting that the record established that her conduct was lawful and that she was, in any event, entitled to qualified immunity as to the federal excessive force claim and public officers' immunity as to the state tort claims. The district court denied her motion, concluding that, on the substantive claims, there were genuine disputes of material fact. It explained that Loveridge and TFO Belton disputed the quality of lighting inside the garage; what Loveridge could see before she shot at Belton; and indeed whether Loveridge had an opportunity to see Belton before the incident occurred. As to qualified immunity, the court observed that "[q]ualified immunity does not alter the ordinary rules applicable to summary judgment proceedings," and it concluded that "a court should deny summary judgment on qualified immunity when a genuine issue of material fact exists regarding the circumstances under which the officer . . . used force against the plaintiff." Finally, the court concluded that the same disputes of fact precluded it from awarding summary judgment to either defendant on Belton's three state law claims.

From the district court's order denying qualified immunity and public officers' immunity, Officer Loveridge filed this interlocutory appeal. TFO Belton filed a motion to

dismiss the appeal for lack of jurisdiction, and we issued an order deferring a ruling on that motion pending oral argument.

II

We address first TFO Belton's motion to dismiss this interlocutory appeal for lack of jurisdiction.

While we would not have jurisdiction at this interim stage of the proceedings to review issues turning on factual disputes, *see Johnson v. Jones*, 515 U.S. 304, 313 (1995), we do have jurisdiction to review the denial of qualified immunity to the extent that the decision turns on a question of law, *see Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

In this case, the district court, when ruling on Officer Loveridge's motion for summary judgment on the merits of TFO Belton's claims, concluded that the facts material to those claims were disputed and therefore denied summary judgment under the well-established summary judgment criteria. And when it turned to Loveridge's claim for qualified immunity, it ruled that the factual disputes with respect to Belton's substantive claims necessarily precluded it from granting immunity. It stated simply that "[i]n Section 1983 law enforcement cases, a court should deny . . . qualified immunity when a genuine issue of material fact exists regarding the circumstances under which the officer detained or used force against the plaintiff." In reaching that conclusion, however, the court failed to conduct the established and distinct analysis required for determining whether to grant qualified immunity. It failed to determine at a particularized level what constitutional or statutory right Loveridge violated and whether that right was clearly established at the time

7

of her conduct. Both are questions of law for the court, not of fact. *See Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007); *Rambert v. City of Greenville*, 107 F.4th 388, 393 (4th Cir. 2024).

Because the legal standard for granting or denying immunity is at issue and review of that standard is a question of law, we have jurisdiction to address the issue on interlocutory appeal. *See Mitchell*, 472 U.S. at 530; *Thurston v. Frye*, 99 F.4th 665, 672 (4th Cir. 2024).

III

In asserting qualified immunity, Officer Loveridge contends that an officer does not violate the Fourth Amendment when she uses lethal force to counteract a deadly threat to herself or others — even if the officer mistakenly shoots the wrong person. She traces that rule to our decisions in *McLenagan v. Karnes*, 27 F.3d 1002 (4th Cir. 1994), and *Milstead v. Kibler*, 243 F.3d 157 (4th Cir. 2001), in which we held that officers did not violate the Fourth Amendment when they had probable cause to use deadly force but shot someone they erroneously but reasonably perceived to be the suspect. She also contends that even if she violated TFO Belton's Fourth Amendment rights, those rights were not clearly established such that every reasonable officer in her circumstances would have known that he or she was violating the Fourth Amendment.

TFO Belton appears to argue that there is indeed a factual dispute over whether Officer Loveridge *deliberately* shot him and that, in those circumstances, the rule set forth in *McLenagan* and *Milstead* is inapplicable. As he puts it, "This case is not a case of

8

mistake; it is a case where Defendant Loveridge 'could see that Plaintiff was a law enforcement officer before she shot him.'"

First, while the district court found a factual dispute whether Officer Loveridge had an opportunity to see TFO Belton *before the door was breached*, we find no evidence in the record from which to conclude that Officer Loveridge intended to shoot TFO Belton instead of the suspect. But this does not determine whether Officer Loveridge is protected by qualified immunity. And the district court did not apply the well-established analysis for determining Loveridge's qualified immunity, *vel non*.

Under the well-established analysis, Officer Loveridge would be entitled to qualified immunity from a § 1983 claim *unless* (1) she violated a constitutional or statutory right, and (2) the right was clearly established at the time she acted. *See District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018); *Thurston*, 99 F.4th at 673. And a court is free to address these two prongs in any order it finds prudent. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Relative to the first prong, TFO Belton alleged that Officer Loveridge unreasonably seized him, as proscribed by the Fourth Amendment, when she shot and injured him. While the Fourth Amendment does protect against unreasonable seizures, it is not unreasonable for a police officer to "use deadly force when the officer has sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (citing *Tennessee v. Garner*, 471 U.S. 1 (1985)). And this "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain,

9

and rapidly evolving — about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). The test is, at bottom, one of *objective* reasonableness, "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. On this issue, Officer Loveridge has directed us to our decisions in *McLenagan v. Karnes* and *Milstead v. Kibler*, where officers mistakenly shot persons and were found not to have violated the Fourth Amendment.

In *Milstead*, which more closely resembles this case, police officers responded to a 911 call conveying that Milstead and his fiancée were under attack. 243 F.3d at 160. Milstead told the operator that his fiancée's ex-boyfriend had shot both Milstead and his fiancée. *Id.* When the officers arrived at Milstead's house and found bloodstains on the step leading up to the house, they kicked down the front door and saw two figures wrestling on the floor. One had a gun and pointed it at the officers. The officers backed away, and one of them moved from the front door to an outside corner of the house. *Id.* A few moments later, that officer heard someone in the house say that he would "kill all of you," and a figure then sprinted out of the front door and hurdled toward the officer with his hands at chin level. *Id.* The officer shot him twice, believing that he was the assailant. Unfortunately, the sprinting figure was not the assailant, but instead Milstead, who died after being transported to the hospital. *Id.* at 161.

Milstead's estate sued the officer and, in its complaint, alleged that the officer used excessive force, in violation of the Fourth and Fourteenth Amendments. We rejected that claim. We concluded that the officer did not violate the Fourth Amendment because, even

10

though he seized Milstead by shooting him, his use of force was not unreasonable in the circumstances. *Milstead*, 243 F.3d at 164–65. In reaching that conclusion, we distinguished between two types of mistakes. We explained that under the first type, where an officer shoots at a suspect but misses and accidentally hits a bystander, there is no seizure under the Fourth Amendment because the "means of the seizure [are] not deliberately applied to the victim." *Id.* at 163–64. Under the second type of mistake, which is analogous to the mistake made here by Officer Loveridge, an officer deliberately shoots an innocent victim, "believing him, although mistakenly, to be the suspect." *Id.* at 164. We held that such a shooting is indeed a seizure because the officer intentionally directs his force against the victim, even though the officer believes the victim to be someone else. But we concluded in *Milstead* that the officer did not use excessive force because the victim was sprinting toward the officer in an apparently threatening manner, even though that person turned out to be Milstead, not the suspect. *See id.* at 165.

Thus, in this case, while it is clear that Officer Loveridge did indeed seize Belton when she shot him, the key question is whether that seizure was unreasonable. A court would have to resolve whether the officer's use of deadly force was objectively unreasonable in the particular circumstances that Officer Loveridge faced. This "reasonableness" test "is not capable of precise definition or mechanical application," *Bell v. Wolfish*, 441 U.S. 520, 559 (1979), but turns on "the facts and circumstances of each particular case," *Graham*, 490 U.S. at 396. Moreover, a court assessing reasonableness must not substitute its judgment for "the split-second judgment of a trained police officer," even if the officer's judgment ends up being mistaken. *McLenagan*, 27 F.3d at 1007–08.

11

Instead, "the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer" in the same uncertain and rapidly evolving circumstances. *Aleman v. City of Charlotte*, 80 F.4th 264, 285 (4th Cir. 2023) (cleaned up). And in the case of mistaken identity, we have said that if the officer's use of deadly force was otherwise justified, the relevant question is whether the officer had an "objectively reasonable belief" that the innocent victim was in fact the suspect. *Milstead*, 243 F.3d at 165.

In addition to the first prong, the court must also address the second prong and determine whether the constitutional right was clearly established, which the Supreme Court has defined by several measures. First, the right must be settled, *i.e.*, dictated by controlling authority. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011); *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (per curiam). It must also not be defined at "a high level of generality." *Wesby*, 583 U.S. at 63–64 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). Rather, the right must be defined with such particularity as to apply clearly to the specific circumstances facing the officer. *See Plumhoff*, 572 U.S. at 778–79. If a court properly defines the right, the unlawfulness of the officer's conduct should "follow immediately" from the conclusion that the rule "was firmly established." *Wesby*, 583 U.S. at 64 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

And in the context of the Fourth Amendment, "specificity" in defining the right "is especially important." *Mullenix*, 577 U.S. at 12; *see also Omeish v. Kincaid*, 86 F.4th 546, 555 (4th Cir. 2023). This is so "because of the great number of variations in fact involved in seizures implicating the Fourth Amendment." *Omeish*, 86 F.4th at 556; *see also Ziglar*

12

*v. Abbasi*, 582 U.S. 120, 151 (2017). Otherwise, officers will find themselves struggling to discern how the Fourth Amendment's general contours apply to the particular facts before them. *Mullenix*, 577 U.S. at 12. Therefore, the Supreme Court has instructed courts to identify caselaw addressing similar circumstances — cases "where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam).

Also, as to whether the right was *clearly* established, the Supreme Court has stated that caselaw must be so clear that "*every* reasonable official would understand that what he was doing was unlawful." *Wesby*, 583 U.S. at 63 (cleaned up). It must place the constitutionality of conduct facing the officer "beyond debate." *Ashcroft*, 563 U.S. at 741. Put another way, an officer is entitled to qualified immunity unless *no reasonable officer* from his vantage point could "reasonably have believed" that he acted lawfully. *Anderson*, 483 U.S. at 641. Thus, as the Supreme Court has stated, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *White*, 580 U.S. at 79 (cleaned up).

Because the district court in this case failed to conduct the immunity analysis, particularly by failing to identify the clearly established right at issue, we vacate the court's order and remand to enable it to conduct the appropriate analysis. And similarly, because officers are not entitled to public officers' immunity under North Carolina law if they violate clearly established rights, *Bailey v. Kennedy*, 349 F.3d 731, 742 (4th Cir. 2003), we

13

14

likewise vacate and remand the district court's determination that Officer Loveridge was not entitled to immunity on Belton's state law claims.

VACATED AND REMANDED WITH INSTRUCTIONS